UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 19-CV-02142-RMR-KAS

GREGORY J. SHUGARS, *an individual*; and
GAYLE A. SHUGARS, *an individual*,

    Plaintiffs,

v.

JOHN GLISMANN, M.D., *an individual*;
DAWN KOPF, P.A., *an individual*; and
and ASPEN VALLEY HOSPITAL DISTRICT d/b/a ASPEN VALLEY HOSPITAL,
*a Nonprofit Corporation*,

    Defendants.

### DEFENDANT ASPEN VALLEY HOSPITAL'S MOTION FOR JUDGMENT AS A MATTER OF LAW (DIRECTED VERDICT) ON PLAINTIFFS' EMTALA CLAIMS

Aspen Valley Hospital ("AVH") respectfully submits this Motion for Judgment as a Matter of Law (Directed Verdict) pursuant to Fed. R. Civ. P. 50(a)(1) to dismiss Plaintiffs' claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd, in accordance with Civ. Practice Standard 10.1.

### INTRODUCTION

Plaintiffs' EMTALA claims must be dismissed at the close of Plaintiffs' case as the received evidence does not establish federal liability as a matter of law. Plaintiffs' evidence has been focused on establishing that the standard of care required a CT Runoff Study to rule arterial occlusion, rather than establishing that the medical screening exam provided to Mr. Shugars was inadequate under the law. Plaintiffs did not and cannot introduce evidence that AVH provided a medical screening exam that was different or

dissimilar to patients that AVH perceived to have the same signs and symptoms as Greg Shugars.

Plaintiff's statutory stabilization claim similarly fails. Here, Plaintiff argue that the Court should allow this claim to go to the jury because the "actual knowledge" required to trigger the duty to stabilize can be inferred from the inclusion of arterial occlusion in the differential diagnosis and other evidence. This argument ignores Plaintiffs' own experts' testimony that the care providers discharged Mr. Shugars with the diagnosis of leg cramps and/or dehydration, not arterial occlusion.  AVH cannot be liable under EMTALA on the basis that the providers should have diagnosed arterial occlusion prior to discharge.  This approach has been precluded by controlling Tenth Circuit authority.

EMTALA is not a federal medical malpractice statute.  Dismissing these claims will not impact the common law negligence claims against the defendants.  As there is no EMTALA violation, the jury should be instructed to focus on the common law negligence claims in resolving this dispute for the parties.

## **LEGAL STANDARD**

Federal Rule of Civil Procedure 50(a)(1) provides that judgment as a matter of law is appropriate where "a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." The Tenth Circuit has read Rule 50(a)(1) to mean judgments as a matter of law may be granted "if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 797 (10th Cir. 2001).

2

## ARGUMENT

Plaintiffs' EMTALA claims must be dismissed because there is not a legally sufficient basis for the jury to find EMTALA was violated. Congress enacted EMTALA to stop "patient dumping" by requiring ERs to complete "appropriate" medical screening examinations with their capabilities and to stabilize patients with a known emergency medical condition ("EMC") before transferring or discharging them" *Id.* at 797.

"EMTALA's provisions only have a limited reach and purpose. EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws." *Phillips*, 244 F.3d at 798; *Barber v. Hosp. Corp. Am.*, 977 F.2d 827, 879 (4th Cir. 1992) ("ETMALA does not impose on hospitals a national standard of care in screening patients."); Instead, EMTALA provides a remedy, "generally unavailable under state tort law, for what amounts to a failure to treat." *Summers v. Baptist Med. Cntr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) ("every court that has considered EMTALA has disclaimed any notion that it creates a general federal cause of action for medical malpractice in emergency rooms.").

Plaintiffs claim ETMALA was violated in two ways. First, Plaintiffs argue Mr. Shugars did not receive an "appropriate medical screening examination" under EMTALA because AVH did not perform a CT runoff study (the "Screening Claim"). Second, Plaintiffs argue Mr. Shugars was discharged from AVH in an unstable condition (the "Stabilization Claim). These claims must be dismissed because are thinly veiled negligence claims unsupported by the evidence required to impose liability under EMTALA.

3

**I. There is no evidence that AVH treated Plaintiff different from every patient presenting to AVH that is perceived to have the same or similar symptoms**

EMTALA requires hospitals to provide an "*appropriate*"[1] medical screening examination within the capability of the hospital's emergency department, including ancillary services routinely available to the emergency department, to determine whether or not an emergency medical condition" ("EMC") exists. 42 U.S.C. §1395dd(a)

To prevail on a claim that EMTALA was violated because an "appropriate medical screening" was not provided, a plaintiff must prove that the hospital treated him differently than every patient "*perceived*" to have similar symptoms and conditions. *Phillips,* 244 F.3d at 797 (quoting *Vickers v. Nash Gen. Hosp. Inc.*, 78 F.3d 139, 143 (4th Cir. 1996)); *Koel v. Citizens Med. Cntr.*, No. 2:21-CV-2166-HLT, 2023 WL 6597688, at *5 (D. Kan. Oct. 10, 2023) ("plaintiff must establish that the hospital treated him differently than others in like circumstances."); *Etter v. Bibby*, No. 10-CV-00557-JLK-CBS, 2011 WL 5216855, at *3, *8 (D. Colo. Nov. 2, 2011) (citation omitted) ("plaintiff must show that the hospital in question treated him or her differently than other patients with similar conditions."). A hospital does not violate the screening requirement "when it conforms in its treatment of a particular patient to its standard screening procedures." *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994) (quoting *Gatewood v. Wash. Healthcare*, 933 F.2d 1037, 1041 (D.C.Cir.1991)). "Of course, this standard does not mean that any slight deviation by a hospital from its standard screening policy violates EMTALA." *Id* at 523.

---

[1] All emphasis added unless otherwise indicated.

4

If the hospital performs its standard screening there is no violation, even "if [the hospital] fails to detect or if it misdiagnoses an emergency medical condition." *Bryant v. Adventist Health Sys.*, 289 F.3d 1162, 1166 (9th Cir. 2002); *Phillips,* 244 F.3d at 798 ("EMTALA, unlike traditional state negligence or malpractice law, does not provide a remedy for an inadequate or inaccurate diagnosis."); *Collins v. DePaul Hospital,* 963 F.2d 303, 307 (10th Cir.1992) (quoting language in *Gatewood* stating that section 1395dd(a) was not intended "to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly"). Therefore, the "appropriateness of the screening [is not] to be determined by its adequacy in identifying the patient's illness, *Holcomb v. Monahan*, 30 F.3d 116, 117 (11th Cir. 1994), or by its accuracy in diagnosis. *Vickers v. Nash Gen. Hosp., Inc.*, 78 F.3d 139, 143 (4th Cir. 1996). Stated another way, the hospital's screening can comply even if it is inadequate to the task of diagnosing the condition, and even if it is inaccurate in diagnosing the correct condition.

Accordingly, evidence that a hospital violated the standard of care is not a legally sufficient basis for a jury to find a hospital violated EMTALA's requirement to give an appropriate medical screening requirement. An illustrative example of 10th Circuit district court decisions regarding EMTALA is *Kilroy v. Star Valley Med. Ctr.*, 237 F. Supp. 2d 1298, 1301 (D. Wyo. 2002), in which a child died after the ER failed to identify the condition that caused her death the morning after she was discharged. In that case, as in the instant case, the condition was not diagnosed despite examination by a staff doctor.

*Id.* at 1305. The doctor made a differential diagnosis (possible explanations for symptoms), but could not determine which condition therein was correct. *Id.* at 1301.

Although the criticisms of the screening examination were indistinguishable from the standard of care for malpractice, the *Kilroy* plaintiffs argued EMTALA liability attached because the hospital did not comply with its own policies and procedures. *Id.* at 1305. The Court acknowledged that various policies were arguably violated, including policies that required full documentation, reassessments of vital signs, and notations regarding the patient's specific condition at discharge. *Id.* Nonetheless, the Court dismissed plaintiffs' EMTALA screening claim as a matter of law because these violations did not show that the patient "was a victim of patient 'dumping' or disparate treatment." *Id.*

In another Tenth Circuit district court decision, *Koel*, 2023 WL 6597688, at *3-4, a patient was evaluated pursuant to a policy that, like the policy at issue here [Ex. 1 (Trial Ex. 161) at 1-2], required patients be given a medical screening examination to determine, "with a reasonable degree of clinical confidence, … whether the patient has an emergency medical condition." The condition that caused the patient to lose his vision was in the differential diagnosis. *Id.* at *2. The doctor conducted a test to identify the condition; it was negative, but it did not rule out the suspected condition. *Id.* The patient was discharged with instructions to see an ophthalmologist the next day. *Id.* at *3. As a result, the patient was diagnosed with the suspected condition the next day, had surgery, and lost his sight. *Id.* The patient argued an "appropriate medical screening" was not given because the hospital violated its policy "that required that emergency care be delivered in accordance with the standard of care." *Id.* at *9. The district court rejected this argument

6

and dismissed the EMTALA claims because "whether [the hospital] made a mistake in its diagnosis and treatment is a matter of state of law." *Id*. at *1, *9.

The Eighth Circuit's opinion in *Summers*, 91 F.3d at 1138-39, further demonstrates that a violation of EMTALA's "appropriate medical screening" requirement cannot be based on a negligent failure to include a test as part of the screening. In *Summers*, the hospital admitted that "a patient complaining of snapping and popping noises in his chest would have been given a chest x-ray." *Id*. at 1138. The court assumed, for the purposes of a motion for summary judgment, that the patient made such complaint, but was not given the x-ray. *Id.* Nonetheless, the Eighth Circuit rejected the argument that the patient there received differential treatment and EMTALA liability attached. *Id.* Instead, it held that "instances of negligence in the screening or diagnostic process, or of mere faulty screening, are not" actionable under EMTALA" and affirmed the district court's decision to dismiss plaintiff's claim that the failure to give the x-ray violated EMTALA. *Id*. at 1139.

Here, undisputed evidence demonstrates that Plaintiff Gregory Shugars was seen and examined by multiple personnel in AVH's ER within minutes. It is undisputed that he was triaged by RN Perillo, was examined by PA Kopf, received a battery of tests, and was offered an additional test at the hospital. It is undisputed that Mr. Shugars' chief complaint was leg cramps that prevented him from standing, and that he had not been drinking enough water and needed IV fluid to address cramping.

The uncontested evidence shows that AVH performed a series of tests to assess Mr. Shugars' symptoms, including blood work, urinalysis, an EKG, and a lower extremity doppler ultrasound to check for deep venous thrombosis. It also shows there is no dispute

that Mr. Shugars was provided IV hydration and Ativan for anxiety, neither of which are interventions that would treat or resolve pain. There is no dispute that after being triaged, examined, and provided numerous tests and results, Mr. Shugars was offered a CT Runoff Study. Plaintiffs' experts advocated that the Runoff was required to complete the medical screening examination. Plaintiff declined the Runoff.  As in *Kilroy*, "[t]hese facts, do not show that [Plaintiff] was a victim of 'dumping' or disparate treatment." 237 F.Supp. 2d at 1306 (granting hospital summary judgment on EMTALA screening claim).

Plaintiffs' Screening Claim must be dismissed because there is not a legally sufficient basis to find in his favor. Plaintiff concedes that the "thrust" of his Screening Claim is that AVH "failed to obtain testing necessary to determine whether Mr. Shugars had an EMC as AVH's own standards required them to do. [ECF No. 209, Pltfs' Resp. to Defs AVH and Kopf's Trial Brief, at 3-4] Plaintiffs' experts testified that AVH violated EMTALA's "appropriate medical screening" requirement because EMTALA and AVH's policies required AVH to obtain a CT Runoff Study, and the study was not performed. [*Id.* at 2-3; ECF No. 210, Pltfs.' Resp. to Def. Glismann's Trial Brief, at 4 ("Dr. Langdorf will testify that an appropriate medical screening under EMTALA and AVH's policies required [AVH] to obtain a CT runoff study."); Ex. 2 (Trial. Tr. Day 2) at 236:6-16, 240:22-241:18, 242:23-243:6; Ex. 3 (Trial Tr. Day 3) at 530:16-24, 536:22-537:13, 538:9-539:9, 539:19-21. Plaintiffs' experts further testified, and Plaintiffs argue, that, in addition to allegedly constituting an EMTALA violation, the failure to perform the CT Runoff Study violated the standard of care. [Ex. 2 at 241:10-18, 242:23- 243:6, 244:21-245:5; Ex. 3 at 539:15-21;

ECF No. 209 at 4 ("It just so happens this failure to obtain the test is also a deviation from the standard of care")]

Plaintiffs' experts concede that their opinions are not based on evidence that AVH treated Plaintiff differently or dissimilarly to the way it treats every patient perceived to have the same medical condition. In fact, Dr. Langdorf admitted that the way AVH treats other patients is irrelevant to this opinion because "Other patients don't matter[.]"[2] [Ex. 2 at 355:25-356:3, 356:8-17] Instead, he testified that his opinion was based on a violation of the standard of care. [*Id.* At 313:8-15, 314:5-10] Instead he testified that his EMTALA opinion is solely based on the standard of care. PA Sherman similarly testified that her EMTALA opinion was based on her (mistaken) understanding that EMTALA requires the hospital to rule out an EMC "consistent with the standard of care." [Ex. 3 at 605:17-18]

Plaintiffs' experts are misinformed. The Tenth Circuit has expressly stated that EMTALA does "not set a federal standard of care" and does not provide a remedy for an "inadequate examination." *Phillips*, 244 F.3d at 798 (affirming Rule 50 dismissal of screening claim). And it has held, contrary to Dr. Langdorf's understanding, that "a hospital's obligation under EMTALA is measured by whether it treats every patient perceived to have the same medical condition in the same manner." *Id.* at 797.

---

[2] Dr. Langdorf also testified that he "wouldn't have any way of knowing" if Mr. Shugars received different treatment from patients presenting to AVH with the same signs and symptoms as Mr. Shugars because he "can't get charts on patients who weren't Mr. Shugars" if he wanted to. [Ex. 2 at 353:24- 355:1] Dr. Langdorf's understanding is incorrect. Courts routinely allow EMTALA plaintiffs to access such records. *E.g.*, *Etter v. Bibby*, 2011 WL 5216855, at *8 (D. Colo. Nov. 2, 2011) (granting patient's motion to compel hospital to produce peer review records of "other patients presenting at the emergency department with similar symptoms and conditions.").

9

Plaintiffs' experts' opinions that a Runoff Study was not performed are not a legally sufficient evidentiary basis to find for Plaintiff on his Screening Claim. *E.g.*, *Phillips*, 244 F.3d at 795, 798-799 (affirming Rule 50 dismissal of screening claim, holding evidence that policy resulted in "inadequate treatment" was insufficient, and district court correctly "ruled no evidence of differential treatment was presented and, at most, the complained of conduct amounted to negligence."); *Summers*, 91 F.3d at 1139 (affirming summary judgment dismissal of claim that the failure to give x-ray violated EMTALA because "instances of negligence in the screening … process ... are not" "actionable under EMTALA"); *Koel*, 2023 WL 6597688, at *9 (dismissing claim that hospital's failure to rule out condition in differential diagnosis violated EMTALA because whether hospital "made a mistake in diagnosis and treatment is a matter of state law.").

Plaintiffs' argument to the contrary relies on an inaccurate reading of a different circuit court's opinion in *Power v. Arlington Hosp. Ass'n*, 42 F.3d 851 (4th Cir. 1994). [ECF No. 209 at 3-4]. Plaintiffs' reliance on *Power* is misplaced for at least three reasons. *First*, and most importantly, *Power* does not hold that a violation of the standard of care can, standing alone, establish an evidentiary basis for a violation of EMTALA's screening requirement. Instead, *Power* holds that "***after*** a plaintiff makes a threshold showing of differential treatment"  a hospital is allowed "to offer evidence rebutting that showing by demonstrating … that the test or procedure was not given because the physician did not believe that the test was reasonable or necessary under the particular circumstances of that patient," and "***[i]f*** a hospital offers such rebuttal evidence, fairness dictates that the

10

plaintiff should be allowed to challenge the medical judgment of the physicians involved through her own expert medical testimony." *Power*, 42 F.3d at 858.

*Second*, the hospital in *Power* had no written protocols or procedures describing how providers should conduct an appropriate medical screening examination. *Id.* at 855. Here, AVH has a written EMTALA policy that defines, and provides guidance on, medical screening examinations. [Trial Ex. 161] *Third*, the patient in *Power* "presented evidence that the doctor "deviated from the hospital's usual procedures when he discharged the patient before the results" of the "only diagnostic procedure" ordered was returned. *Power*, 42 F.3d at 855, 858; *Guzman v. Memorial Hermann Hosp. Sys.*, 409 Fed.Appx. 769, 774-775 (5th Cir. 2011) (distinguishing *Power* and affirming summary judgment dismissal of EMTALA screening claim). Here, multiple diagnostic procedures were given (e.g., blood work, urinalysis, EKG, ultrasound), the results were all reviewed before discharge, and Plaintiffs are arguing that AVH violated its policy because it failed to abide the standard of care set forth therein because it did not perform the Runoff that Plaintiff declined.

Plaintiffs' Screening Claim should be dismissed because there is no evidentiary basis to find Plaintiff was treated differently from every other patient AVH perceived to have the same medical condition as Plaintiff.

## II. The Stabilization Claim must be dismissed because it is undisputed that AVH did not have actual knowledge of an emergency medical condition

AVH submits that it has no liability for failure to stabilize or transfer because it did have "actual knowledge" of an arterial occlusion, thus the hospital was not required to (even though it did) stabilize Plaintiff. Nor was AVH required to transfer Plaintiff to another

11

hospital. Those EMTALA obligations are not triggered because AVH did not detect the emergency medical condition that Plaintiff claims was the cause of his damages.

The Tenth Circuit has unequivocally held that "the plaintiff must prove the hospital had actual knowledge of the individual's unstabilized emergency medical condition to succeed with a claim under § 1395dd(c)." *Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994). In *Urban*, a pregnant patient was discharged despite a nonreactive stress test after a nurse who administered the test contacted a physician, who advised that the patient should be sent home with instructions to return the following morning for another test. The next morning, after the additional test, an emergency C-Section resulted in the delivery of one deceased twin and a surviving twin who suffered significant brain injury. *Id.* at 525.

The Court analyzed 42 USC §1395dd(b) and (c), finding that they are explicitly linked to each other such that "the application of subsection (c) depends on the language of subsection (b)." *Id.* at 526. Subsection (b) is the "stabilization or transfer" requirement:

> If any individual … comes to a hospital and the hospital *determines that the individual has an emergency medical condition*, the hospital must provide either—
>
> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition,
>
> (B) for transfer of the individual to another medical facility in accordance with subsection (c).

42 USCS § 1395dd(b). Subsection (c) prohibits transfer of a patient with an unstabilized emergency medical condition unless certain conditions are met.

The Tenth Circuit held that the interplay between these subsections establishes that "the requirement of **actual knowledge** of an emergency medical condition":

> The provisions of § 1395dd(c) are triggered only if § 1395dd(b)'s requirements have been met: If a hospital "determines that the individual has an emergency medical condition," under § 1395dd(b), then the hospital must comply with the requirements of § 1395dd(c). *See* 42 U.S.C. § 1395dd(b). Subsection 1395dd(c) delineates what must be done before the individual may be transferred. *See* 42 U.S.C. § 1395dd(c). Therefore, § 1395dd(c) only comes into effect if the hospital has "determined" an emergency medical condition exists pursuant to § 1395dd(b). ***The statute's stabilization and transfer requirements do not apply <u>until</u> the hospital determines the individual has an emergency medical condition.***

*Urban*, 43 D.3d at 526. *Urban* remains good law and is frequently cited by Courts across the country dismissing EMTALA stabilization claims on summary judgment. *E.g.*, *Etter v. Bibby*, No. 10-CV-00557-JLK-CBS, 2012 U.S. Dist. LEXIS 34789, at *13 (D. Colo. Mar. 14, 2012) ("*Etter II*") ("When the patient has no diagnosed EMC, the duty to stabilize does not apply); *Guzman v. Mem'l Hermann Hosp. Sys.*, 637 F. Supp. 2d 464, 508 (S.D. Tex. 2009), *aff'd*, 409 F. App'x 769 (5th Cir. 2011).

Indeed, less than one year ago, a district court in this Circuit cited *Urban* and dismissed an EMTALA stabilization claim on summary judgment on facts similar to the instant case. In *Koel*, the patient claimed the hospital improperly discharged him "without first stabilizing" his emergency medical condition, which appeared in the provider's differential diagnosis. 2023 WL 6597688, at *11. The court acknowledged, however, that a "possible diagnosis or inclusion in the differential diagnosis does not equate to … <u>actual knowledge</u> that" the patient had an EMC. *Id.* (emphasis in original). The patient urged the court to find that liability under EMTALA's stabilization provisions still attached because the hospital should have transferred the patient to a different hospital when the doctor and PA could not rule out the suspected EMC. *Id.* at *2, 11. The Court declined and

13

dismissed the stabilization claim, holding that the hospital did not determine the patient had an EMC. *Id.* at *11.

Here, the Court should dismiss the Stabilization Claim because it is undisputed that AVH did not have "actual knowledge" of an arterial occlusion at the time of discharge. By Plaintiffs' own admission, Mr. Shugars was not diagnosed with an arterial occlusion until after AVH discharged him, when the Runoff Study was performed at Valley View Hospital. [ECF No. 193, Final Pretrial Order, at 4] Plaintiffs' own experts testified that AVH did not diagnose an arterial occlusion, only diagnosed leg cramps and dehydration, which are non-emergent conditions, [*e.g.*, Ex. 2 at 332:10-20, 334:4-8], and did not provide a Runoff Study, which was required because "you would need imaging" in this case to determine whether or not Plaintiff had an arterial occlusion, [*e.g.*, Ex. 3 at 440:24-441:12, 446:3-447:1] Thus, by Plaintiffs' own admission, AVH had no actual knowledge.

The Court should reject Plaintiffs' argument that actual knowledge can be inferred because there is evidence that (1) an arterial occlusion was in the differential; (ii) providers acknowledged Plaintiffs' condition could be an urgent EMC that could get worse, recommended the Runoff Study, and knew they would need the Runoff to offer an opinion; and (iii) Plaintiff had 7/10 pain at discharge[3] that conflicts with contemporaneous medical record documenting "symptoms resolved." [ECF No. 160-1 at 3-4] That argument is at odds with clearly established, controlling Tenth Circuit law. *Urban*, 43 F.3d at 526 (10th Cir. 1994) (holding hospital was "entitled to judgment as a matter of law" because there

---

[3] This evidence comes from Plaintiff's deposition—taken years later—wherein he admitted that he did not report this pain to Dr. Glismann. [Ex. 3 at 514:4-17]

14

was "no dispute as to the hospital's lack of knowledge."); *see also Koel*, 2023 WL 6597688, at *511 ("possible diagnosis or inclusion in the differential diagnosis does not equate to … actual knowledge that" the patient had an EMC. *Id.* (emphasis in original). Allowing this Stabilization Claim to go to the jury on this "'should have known standard'… would swallow malpractice and overextend Congress' intended reach." *Etter II*, 2012 U.S. Dist. LEXIS 34789, at *13 (D. Colo. Mar. 14, 2012).

## **CONCLUSION**

As demonstrated above, the evidence points but one way and is susceptible to no reasonable inferences that support Plaintiffs' claims that he failed to receive the uniform screening at AVH, and that AVH had actual knowledge of an EMC, and violated a concomitant duty to stabilize. For this reason, AVH respectfully requests the Court grant its motion pursuant to Federal Rule of Civil Procedure 50(a)(1), and dismiss Plaintiffs' EMTALA claims as a matter of law.

Dated: September 15, 2024

        Respectfully submitted,

        *s/ Stephen J. Segall*
        Aaron P. Bradford
        Stephen J. Segall
        Briana D. Long
        Sheridan Ross P.C.
        1560 Broadway, Suite 1200
        Denver, CO 80202-5141
        Phone: (303) 869-5141
        Facsimile: (303)-863-0223
        abradford@sheridanross.com
        ssegall@sheridanross.com
        blong@sheridanross.com

        *Attorneys for Defendants Dawn Kopf, P.A. and Aspen Valley Hospital District*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 15, 2024, I electronically filed a true and exact copy of the above with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following email addresses:

| | |
|---|---|
| Jim Leventhal<br>Julia T. Thompson<br>Curtiss S. Schreiber<br>Levanthal Puga Braley P.C.<br>950 South Cherry Street,<br>Suite 600<br>Denver, Colorado 80246<br>jim@leventhal-law.com<br>jthompson@leventhal-law.com<br>cschreiber@leventhal-law.com<br><br>*Attorneys for Plaintiffs* | Amy Cook Olson<br>Angela Lund Klein<br>Klein Cook Olson, LLC<br>2130 Resort Drive Unit E<br>Steamboat Springs, CO 80487<br>acookolson@kco-law.com<br>aklein@kco-law.com<br><br>*Counsel for Defendant*<br>*John Glismann, M.D.* |

*s/ Stephen J. Segall*
Stephen J. Segall