## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 1:19-CV-02142-RMR-KAS

GREG J. SHUGARS, an individual, and
GAYLE A SHUGARS, an individual,

    Plaintiff,

v.

JOHN GLISMANN, M.D., an individual,
DAWN KOPF, P.A., an individual, and
ASPEN VALLEY HOSPITAL DISTRICT d/b/a ASPEN VALLEY HOSPITAL, a Nonprofit Corporation.

    Defendants.

## PLAINTIFFS' AMENDED RESPONSE TO DEFENDANTS ASPEN VALLEY HOSPITAL'S MOTION FOR DIRECTED VERDICT ON EMTALA CLAIMS

### INTRODUCTION

While heavy with legal authority, AVH's motion ultimately fails to establish AVH is entitled to a directed verdict on Plaintiffs' EMTALA claims. With respect to screening, Plaintiffs have presented evidence that AVH, in violation of its own policies and protocols, failed to perform testing necessary to determine whether Mr. Shugars had an arterial occlusion, an emergency medical condition. This emergency medical condition was still on the differential diagnosis of Mr. Shugars' at discharge and Dr. Glismann and PA Kopf both recognized it as a possible cause of Mr. Shugars' sudden and severe leg pain. Succinctly, Mr. Shugars never received the required medical screening examination ("MSE"), i.e. CT run-off study, required by EMTALA. To the extent AVH suggests that Plaintiffs must present evidence that *specific other patients* received different

1

treatment than Mr. Shugars despite presenting with the same complaints, AVH's argument misapprehends the law and, as a practical matter, imposes a burden that is impossible for any civil EMTALA plaintiff to meet.

With respect to stabilization, AVH maintains singular focus on the fact that, technically, Dr. Glismann and PA Kopf never definitively diagnosed an arterial occlusion because they failed to perform the very test they knew was necessary to rule out, or diagnose, that condition. This again is not the correct standard for "actual knowledge" under EMTALA. The evidence presented thus far demonstrates that Dr. Glismann and PA Kopf knew Mr. Shugars had severe sudden onset leg pain, fell to the ground and then was unable to walk. They knew these undeniably concerning symptoms were potentially caused by an arterial occlusion, which they agree constitutes an emergency medical condition. AVH knew, through the knowledge of its agents that AVH tasked with performing the medical screening examination in its stead, that if left untreated, Mr. Shugars' condition could deteriorate resulting in the loss of his leg.

AVH is free to present its own evidence to try to show that the screening it provided to Mr. Shugars was appropriate and in compliance with AVH's protocols for patients with similar complaints, and that Dr. Glismann and PA Kopf truly did not know Mr. Shugars was not suffering from an emergency medical condition at the time of discharge. But these disputes are ultimately questions of fact that the jury must decide. Plaintiffs have presented more than enough evidence for their EMTALA claims to reach the jury.

## ARGUMENT

I. **Plaintiffs Have Presented Evidence that AVH Failed to Comply With Its Own Policies, Which is Sufficient to Support an EMTALA Screening Claim.**

AVH argues Plaintiffs' screening claim should not reach the jury because, according to AVH, "Plaintiffs did not and cannot introduce evidence that AVH provided a medical screening exam that was different or dissimilar to patients that AVH perceived to have the same signs and symptoms as Greg Shugars." (Motion, pp. 1-2.) This argument ignores Plaintiffs' evidence that AVH failed to comply with its own policies and protocols that govern what constitutes an appropriate MSE. The fact that AVH performed some tests but not others, and the fact that AVH's written EMTALA policy is vague as to what precisely constitutes an appropriate MSE for patients who present similarly to Mr. Shugars, does not absolve AVH of liability.

Contrary to AVH's suggestion, Plaintiffs need not show that other specifically identified patients, who presented to AVH with absolutely identical symptoms and complaints as Mr. Shugars, were treated differently than Mr. Shugars (indeed, this would be an impossible standard to meet). Federal Courts of Appeal, including the 10th Circuit, have consistently held, "[e]vidence a hospital did not follow its own screening procedures can support a finding of EMTALA liability for disparate treatment." *See Battle v. Memorial Hospital*, 228 F.3d 544, 558 (5th Cir. 2000) citing *Repp v. Anadarko Mun. Hosp.*, 43 F.3d 519, 522 (10th Cir. 1994); *see also Phillips v. Hillcrest Medical Ctr.,* 244 F.3d 790, 796-7 (10th Cir. 2001). Although EMTALA was enacted as an anti-dumping statute, it does not require motive and a plaintiff need not show the hospital's decision-making was guided by a "desire to shirk the burden of uncompensated care." *Correa v. Hospital San Fransisco*, 69 F.3d 1184, 1193-94 (1st Cir. 1995). Here, AVH has a policy that requires its agents, i.e. the ED physician or his / her delegee, to perform an MSE that is "appropriate to the

individual's presenting signs and symptoms taking into consideration the facility's capability and capacity" and designed "to reach, with reasonable clinical confidence, the point at which it can be determined whether the individual has an Emergency Medical Condition or not." **Exh. 1, Trial Exhibit 161**, pp. 1-2.

Plaintiffs' claim in this case is not merely that AVH violated EMTALA when its tasked agents failed to order a runoff study. Plaintiffs' claim – and the evidence Plaintiffs have presented in support of that claim – is that an appropriate MSE for *any patient* who presents to AVH with severe, sudden onset leg pain that causes the patient to fall to the ground and become unable to walk requires definitive evaluation for arterial occlusion. By failing to order the imaging which AVH itself, through Dr. Glismann and PA Kopf, acknowledges was not only available, but also necessary, to determine whether Mr. Shugars had an arterial occlusion, AVH failed to comply with its own screening procedures. (*See* **Exh. 2, Dr. Langdorf's Testimony, Trial Transcript Day 2**, 190:6-194:9.) This is the same as if Mr. Shugars presented with chest pain and AVH's agents failed to order and perform an EKG, or if he presented with a head injury / altered mental status and AVH failed to obtain brain imaging. Again, Plaintiffs' claim is not merely that AVH, through its agents, should have diagnosed arterial occlusion prior to discharge; it is that AVH did nothing to screen for that condition, in violation of its own policies.

The fact that Mr. Shugars received other tests and treatment at AVH does not alter the fact that AVH failed to screen for arterial occlusion. "[T]he provision of some treatment does not *a priori* satisfy a hospital's statutory obligation to appropriately screen." *Cervantes v. Tenet Hospitals Limited*, 372 F.Supp.3d 486, 494 (W.D. Texas 2019) quoting *Marrero v. Hosp. Hermanos Melendez, Inc*., 253 F.Supp.2d 179, 195 (D.P.R. 2003); *see also Romo v. Union Mem'l*

4

*Hosp. Inc.*, 878 F. Supp. 837, 842-43 (W.D.N.C. 2009) (denying summary judgment for hospital even though hospital performed "numerous tests and procedures" where hospital failed to follow its own procedures). Plaintiffs have presented evidence that AVH – through Dr. Glismann, PA Kopf and RN Perillo – was aware an acute arterial occlusion was a potential cause of Mr. Shugars' presenting 8/10 leg pain and cramping with onset of walking quickly and falling to the ground, that AVH knew what testing was necessary to determine with clinical confidence whether or not he had that condition, that AVH had the capability to perform that testing, and that AVH failed to perform that testing.

The fact that AVH screened for other possible emergency conditions like a DVT does not relieve them of liability, particularly when the DVT test was negative and AVH still failed to order and perform testing for arterial occlusion. AVH's failure to get the runoff study – the one test they needed to screen for arterial occlusion – is not a "de minimis…deviation from policy and practice," as were the deviations from hospital policy at issue in *Koel v. Citizens Medical Center, Inc.*, No. 2:21-CV-2166-HLT, 2023 WL 6597688, at *7 (D. Kan. Oct. 10, 2023). This was an abject failure by AVH to do ***any testing*** to determine whether Mr. Shugars had an arterial occlusion, despite all the evidence that shows AVH's providers knew this testing was necessary. *See, e.g., Kilroy v. Star Valley Medical Center*, 237 F.Supp.2d 1298, 1305 (D. Wyo. 2002) (substantial deviations from hospital practice such that the MSE is "not to designed to identify acute and severe symptoms that alert the physician of the need for immediate medical attention to prevent serious bodily injury" are EMTALA violations).

AVH repeatedly asserts that Plaintiffs' screening claim is based solely on the fact that the runoff study was required by the standard of care, as opposed to "evidence that AVH treated

5

Plaintiff differently or dissimilarly to the way it treats every patient perceived to have the same medical condition." (Motion, p. 8-9.) AVH ignores the extensive evidence Plaintiffs have presented – including documentation in AVH's own medical records and testimony presented through deposition clips played at trial– that Dr. Glismann and PA Kopf both believed the runoff study was necessary to screen for arterial occlusion, which is itself evidence that other patients who present to AVH with symptoms similar to Mr. Shugars' would have received runoff studies. For example, during Jody Sherman's examination, Plaintiffs introduced the following designated deposition statements from PA Kopf:

> Q. (BY MR. LEVENTHAL) The differential diagnosis that you and Dr. Glismann agreed upon included arterial clot, correct?
>
> A. Without the patient, Mr. Shugars, getting the run-off study we did not have enough information for that to remain in our differential. We didn't know.
>
> Q. (BY MR. LEVENTHAL) Well –
>
> A. We recommended the study, his pain resolved, he didn't want the study at the time, so we didn't know, without -- I mean, that's a -- we didn't know. That would have been the study that would have let us know.
>
> Q. What's the difference -- what's the difference between a differential diagnosis and a diagnosis?
>
> A. I think based on the -- the studies and the information that are able to be gathered, you form a diagnosis.

**Exh. 3, Jody Sherman Testimony, Trial Transcript, Day 3,** 436:3-22; **Exh. 4, Kopf Deposition**, 68:16-69:11.

AVH's efforts to distinguish *Powers v. Arlington Hosp. Ass'n* are not persuasive and would frustrate the very purpose of EMTALA's mandates. 42 F.3d 851 (4th Cir. 1994). AVH claims the

6

court's reasoning in *Powers* applies only where a hospital has no written protocols or procedures; because AVH does have a written EMTALA policy that – according to AVH – "defines, and provides guidance on, medical screening examinations," AVH is absolved from liability. But, as AVH has acknowledged in prior briefs, the policies AVH has chosen to promulgate for itself do not specifically outline what constitutes an appropriate MSE for patients with severe, sudden onset leg pain. Having failed to implement a policy that clearly dictates what type of screening such a patient should receive, AVH cannot simply say "we have a policy and we complied with it because we say so." This is precisely what the *Powers* court identified as its concern. 42 F.3d at 858 (hospitals "cannot simply hide behind" a lack of protocols or procedures to avoid EMTALA) citing *Griffith v. Mount Carmel Medical Ctr.*, 831 F.Supp. 1532, 1542 (D. Kan. 1993).

AVH has a generically-worded EMTALA policy that essentially tracks the skeletal requirements of the statute. So how does this Court and / or the jury determine what that policy required in Mr. Shugars' case? Simple: by considering evidence of what **<u>AVH's own providers consider to be a necessary and standard screening protocol for such patients</u>**. which in In this case, an appropriate MSE included screening for arterial occlusion as evidenced by the fact that both Dr. Glismann and PA Kopf believed a runoff study was necessary and that they would have performed one if Mr. Shugars had not left the hospital. *Power*, 42 F.3d at 855-859 (affirming verdict in favor of plaintiff where plaintiff presented expert testimony that "a blood test was a necessary component of an appropriate medical screening examination for a patient who presented…with [plaintiff's] symptoms"). In other words, unlike the cases cited in AVH's Motion, here, there is evidence that AVH and its providers had a "regular practice" or screening patients with symptoms similar to Mr. Shugars' for arterial occlusion, and that this regular practice includes

7

obtaining appropriate imaging studies. *See, e.g., Koel*, 2023 WL 6597688, at *7 (dismissing screening claim based on physician's failure to consult with specialist only after determining that there was no evidence such a consultation was part of the hospital providers' regular practice).

As argued in Plaintiffs' response to AVH's Trial Brief, the fact that there is overlap between Plaintiffs' EMTALA claim and its negligence claims is irrelevant.

**II.     Plaintiffs Have Presented Evidence that AVH Had Actual Knowledge of an Emergency Medical Condition, Despite the Fact that Dr. Glismann and PA Kopf Did Not Perform the Testing Necessary to Confirm or Rule Out the Specific Diagnosis of an Arterial Occlusion**

Contrary to AVH's suggestion, actual knowledge of an emergency medical condition does not mean that a patient's medical providers have reached a single definitive diagnosis of a specific medical problem. Actual knowledge also contemplates situations where, as here, providers have actual knowledge that a patient's symptoms constitute an emergency medical condition but then discharge the patient before taking the steps necessary to definitively diagnose or rule out that emergency condition. *See Dicioccio v. Chung*, 232 F. Supp. 681, 685-93 (denying hospital's motion for summary judgment on EMTALA stabilization claim where evidence was sufficient to show patient had chest pain, and that his chest pain was potentially caused by unstable angina – a medical emergency); *Marrero v. Hospital Hermanos Melendez, Inc.*, 253 F.Supp.2d 179, 197-200 (D. Puerto Rico 2003) (same).

EMTALA defines an EMC as:

> a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in—(i) placing the health of the individual…in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part.

42 U.S.C § 1395dd(e)(1)(A).

A decision by the Georgia Court of Appeals applying EMTALA to facts very similar to the facts in Mr. Shugars' case is instructive. In *Quinney v. Phoebe Putney Memorial Hosp., Inc.*, the plaintiff presented to the ER five days after a spinal cord stimulator implant surgery with complaints of severe back pain and motor weakness. 325 Ga.App. 112, 751 S.E.2d 874, 876-77 (Ga. App. 2013). He was triaged and evaluated by an ED physician. The physician obtained a CT scan of the patient's spine, which was negative, but the physician failed to perform a complete neurologic exam. The physician ultimately diagnosed the patient with "back pain, status post surgery." 751 S.E.2d at 878. The patient was transferred to a different hospital hours later, where it was determined he had a spinal cord and, due to the delayed transfer, was now paralyzed. *Id*.

Reversing the trial court's order granting summary judgment in favor of the hospital on Plaintiff's EMTALA stabilization claims, the court of appeals rejected the hospital's argument that its providers "had no notice or actual knowledge of an emergency medical condition." *Id*. at 882. After reviewing EMTALA's definition of an emergency medical condition, the court held:

> Here, there is sufficient evidence for the jury to find that the hospital, through its agents, was aware that Mr. Quinney was experiencing a medical condition that manifested itself by acute symptoms of severe pain in the area of his spine and that the medical condition had resulted in his inability to ambulate. Moreover, a jury could also find that the hospital was aware that Mr. Quinney's condition was more than just post-operative discomfort, as evidenced by the fact that the massive doses of pain medications that had been administered to Mr. Quinney had little or no effect. In fact, Mr. Quinney's pain had increased to its highest level immediately prior to transfer. ***Even assuming that the hospital was unaware of the specific cause of his pain and inability to ambulate, there is sufficient evidence to allow a jury to decide whether it possessed knowledge of an emergency medical condition, as defined by 42 USCA § 1395dd (e)(1), which would trigger the EMTALA requirement that the hospital provide "further medical examination and such treatment as may be required to stabilize [this] condition" prior to transfer***.

Id. at 882 (emphasis added).

Plaintiffs are not suggesting that AVH had actual knowledge of an EMC only because AVH's providers included "arterial occlusion" on their differential diagnosis (although there is no dispute that they did). Rather, like the plaintiff in *Quinney,* Plaintiffs have presented at least some evidence that Dr. Glismann and PA Kopf knew Mr. Shugars had "a medical condition" with acute, severe symptoms, including severe pain and an inability to walk, and that Dr. Glismann and PA Kopf actually knew "within reasonable medical probability" that this condition would likely deteriorate if Mr. Shugars was discharged without a definitive diagnosis and prompt treatment. 42 U.S.C. § 1985dd(e)(3)(A). While AVH may attempt to its own evidence that AVH had no "actual knowledge" of an EMC (notwithstanding PA Kopf's own deposition statements presented to the jury that she told Mr. Shugars he might have a "limb-threatening condition," or Nurse Perillo's testimony that Dr. Glismann and PA Kopf were still concerned about a clot when they discharged Mr. Shugars), AVH cannot ignore Plaintiffs' evidence. (**Exh. 5, Perillo Testimony, Trial Transcript, Day 1**, 154:10-155:1)

AVH's arguments on stabilization reflect a broader trial strategy by the defense to play both sides of the fence. On one hand, they want the jury to believe that Mr. Shugars was fine. He could walk laps around the ER. His pain had resolved. He did not need further evaluation or treatment, and it was entirely appropriate for Dr. Glismann to discharge him without obtaining the runoff study and without having him sign AVH's AMA forms. On the other hand (in case the jury does not accept defense's first position), they want to the jury to believe that Dr. Glismann and PA Kopf emphasized to Mr. Shugars how important it was for him to get the runoff study before leaving the ER, and that Mr. Shugars' injuries are his own fault because he failed to heed the defendants' dire warnings.

Consider the following questions Dr. Glismann's counsel asked Plaintiffs' ER expert Dr. Mark Langdorf on cross-examination:

> Q. And doctor, as for Dr. Glismann talking to Mr. Shugars about using the CT runoff study to look for heart attack in the legs, you would agree that Mr. Shaw shoe [sic] had the context to know just how threatening a heart attack can be?
>
> A. I think it's reasonable to assume that a patient could extrapolate a heart attack and a leg attack, I won't dispute that.
>
> Q. And it's fair to say that the P A also talked to M r. Shugars about having the runoff study?
>
> A. Again, her testimony, and not reflected on the chart *.
>
> Q. You would agree that if Mr. Shugars was told by PA Kopf that if the study was was needed to rule out a limb threatening condition and Dr. Glismann told him it was to rule out a heart attack of the leg that it would have been unreasonable for Mr. Shugars to decline the study?
>
> A. I don't agree with what you just said, because that presumes he understood that he might lose his leg if he didn't have the study done and both Mr. Shugars and his wife testified that they would have had it done had it been present in those terms, that he would lose his leg.

**Exh. 6, Dr. Landorf Testimony, Trial Transcript, Day 2,** 237:10-238:5.) Defendants cannot seriously contend there is no evidence to suggest Dr. Glismann knew Mr. Shugars had an emergency medical condition while simultaneously presenting evidence that Dr. Glismann told Mr. Shugars he might be having a "heart attack in the legs." Or that PA Kopf did not know Mr. Shugars had an EMC even though she told him his condition was potentially "limb-threatening." This is not a case where Plaintiffs are simply claiming that Mr. Shugars' condition ***should have*** been apparent to AVH, as was the case in *Kilroy*. 237 F.Supp.2d at 1306. Here, there is evidence that AVH, through its agents, Dr. Glismann and PA Kopf knew ***precisely*** what was going with Mr. Shugars but nevertheless allowed him to leave the hospital without ensuring he received definitive

11

treatment, and without following the clear mandates of EMTALA and AVH's own policies pertaining to discharge against medical advice. As Nurse Perillo testified, she overheard Dr. Glismann and PA Kopf discussing "***the fact that they were concerned that the patient might have clots***," and that they felt he needed to get the runoff study. (**Exh. 5**.)

While AVH is certainly free to pursue their two-front trial strategy, they cannot selectively rely on one side of their narrative only when it suits them. Plaintiffs do not deny AVH may present evidence that it did not know Mr. Shugars had an arterial occlusion at discharge (for example, through the entries in AVH's medical records stating his symptoms resolved). But there is also evidence that AVH did know he had an arterial occlusion, and there is certainly evidence that Dr. Glismann and PA Kopf actually knew Mr. Shugars had an EMC even though they failed to perform testing necessary to make a specific diagnosis. Similarly, while there is some evidence Mr. Shugars was stable at discharge, there is also evidence he was not stable, as evidenced by the providers' purported efforts to convince him to get the runoff study and – most obviously - that Mr. Shugars did in fact go on to lose his leg as a result of ischemic tissue damages. Once again, these are factual disputes that must be decided by the jury.

## CONCLUSION

Ultimately, AVH fails to meet the high standard for a directed. The record contains ample evidence that AVH and its providers deviated from hospital policy and regular practice by failing to screen for an arterial occlusion despite knowing this was a competent cause for Mr. Shugars' complaints. The record also contains ample evidence to suggest AVH, through its agents, knew that Mr. Shugars had an emergency condition, knew that his condition would deteriorate without definitive diagnosis and treatment, but nevertheless allowed him to leave the hospital without the

runoff study in an unstable condition. Whatever evidence AVH attempts to present during its case to contradict Plaintiffs' evidence, there is unquestionably sufficient evidence for Plaintiffs' claims to reach the jury. Accordingly, this Court should deny AVH's Motion.

WHEREFORE Plaintiffs request that this Court deny AVH's Motion for Directed Verdict.

Respectfully submitted September 19, 2024.

                              LEVENTHAL PUGA BRALEY P.C.

/s/ *Julia T. Thompson*
Jim Leventhal, #5815
Julia T. Thompson, #25897
Curtiss Schreiber, #57491
Leventhal Puga Braley P.C.
950 South Cherry Street, Suite 600
Denver, CO 80246
Phone:   303-759-9945
Fax:      303-759-9692
jim@leventhal-law.com
jthompson@leventhal-law.com
cschreiber@leventhal-law.com

## CERTIFICATE OF SERVICE

      I hereby certify that on September 19, 2024 I electronically filed the foregoing with the Clerk of the Court using CM/ECF system and served to all counsel of record.

| | |
|---|---|
| Amy Cook-Olson, Esq<br>Angela Klein, Esq<br>Klein Cook Olson, LLC<br>2130 Resort Drive Unit E<br>Steamboat Springs, CO 80487<br>akein@kco-law.com<br>acookolson@kco-law.com<br>***Attorneys for Defendant***<br>***John Glismann, M.D.*** | Aaron Bradford, Esq<br>Stephen Segall, Esq<br>Briana Long, Esq<br>Sheridan Ross, P.C.<br>1560 Broadway, Suite 1200<br>Denver, CO 80202<br>abradford@sheridanross.com<br>blong@sheridanross.com<br>ssegall@sheridanross.com<br>***Attorneys for Defendant Aspen Valley***<br>***Hospital District and Dawn Kopf PA*** |

/s/ *Elizabeth Ponce de Leon-Ward*
Legal Assistant